Please step up and identify yourselves for the record. Good morning, Your Honors. Brett Zeeb from the Appellate Defender's Office on behalf of David Luna. Say it again. Brett Zeeb, B-R-E-T-T, last name Zeeb, E-E-B. William Louis Taffanetti, Assistant State's Attorney for the People for the County State of Omaha. What is your name again? Taffanetti, T-O-F-F-B-N-E-T-T-I. All right. Fifteen minutes per side. If you want time for rebuttal, you can take your time accordingly. Thank you, Your Honors. I'd like a couple minutes for rebuttal, if I may. May it please the Court. It may. Thank you. Your Honors, this case illustrates perfectly why we have and why we need discovery rules and the problems that ensue when those rules are deliberately violated. The prosecutor in this case admitted that he failed to disclose to defense counsel prior to trial an alleged oral statement attributed to David Luna by Ms. Cerna that David intended to shoot Joseph Benitez for taking his co-defendant Daniel Vargas' money. Now, this was the sole direct evidence the State put on at trial that supported its theory that David was accountable for Mr. Vargas' actions and that he knew and participated in this plan to use a gun to collect Mr. Vargas' money. Now, the State acknowledges that the prosecutor didn't turn over this information, so really the only question for this Court is whether David is entitled to a new trial. And because this misconduct prejudiced the defense in a couple key ways, he is entitled to that new trial. First, and most importantly, when this evidence came out during the trial, during Ms. Cerna's direct testimony, it completely blew the initial defense theory right out of the water. Initially, the defense theory was that David was simply not accountable for Mr. Vargas' actions because he wasn't aware of this plan to bring a gun and use that gun or force to collect Mr. Vargas' money. And up until Ms. Cerna testified to this alleged oral statement, the evidence bore that theory out. If you look at the testimony of the State's two key eyewitnesses, the Benitez brothers, Michael and Joseph, their testimony both illustrates that David was surprised when Mr. Vargas took out that gun. When Joseph took the money and then didn't come back, the evidence shows that David called Joseph on the phone and said, hey, what happened? Joseph said, I'll call you back. Never called back. So then they show up back at the house, and the testimony is the same. David knocks on the door. Michael Benitez opens the door. David says, I want to talk to your brother. Don't worry. There's not going to be any trouble. Joseph comes to the door. David doesn't threaten him. He says, what happened? What happened? And Joseph says, just wait a minute, just wait a minute. Ends up going into the garage after he gets a phone call. And then that's when Mr. Vargas comes out of the car and pulls out the gun. And what is David's reaction? It's one of surprise. He says, and this is the Benitez brothers' testimony, chill out. Calm down. Let's forget about it. Let's get out of here. Those are the actions of a person who didn't share in a plan or an intent to use a gun to collect that money. Now, secondly, it not only destroyed that theory of defense, it made the defense counsel look like a liar in the eyes of the jury. In his opening statement, he doesn't say anything about this oral statement because he doesn't know anything about it. He tells the jury, the evidence is going to show that David did not know of this plan. He didn't know that Mr. Vargas was going to bring a gun and use it to collect this money. And that's damage that just can't be undone. So far in the trial, the jury has heard all this evidence that's backing up the defense theory that David didn't know of this plan. All of a sudden, this surprise evidence comes out, and the jury had to be taken aback by that. The record is a little unclear. When the court was apprised of what had happened, I believe shortly before lunch after the cross-examination of Vanessa, and I'd like to hear your interpretation or your take on when it was that the revelation was disclosed to defense counsel. The revelation was disclosed to the defense counsel, Your Honor, when Ms. Cerna actually uttered those words in her direct testimony. The prosecutor admitted in the sidebar that he learned of this. According to the prosecutor, he learned of this alleged oral confession by David when he was prepping Ms. Cerna that morning for her testimony later that afternoon. That's what's confusing because the entire colloquy, after the defense alerts Judge Fekirada to that, the court says, State, would you like to respond? The ASA says, Judge, we did tell counsel that this statement that she made was not in any report. She was asked about that on the witness stand, and this was a statement that she just disclosed when she was interviewed. The court then says, when was that? State's attorney says, this morning, Judge, and then the court says motion for mistrial is denied. Your position is clearly from that colloquy that the defense was not alerted to this before she took this hand? Absolutely, Your Honor, and that's what the defense counsel says in that sidebar. Did the state admit to that? The state does not deny that. They said this morning. This morning when they were prepping this witness for trial, and what's critical is that the prosecutor has an ongoing duty to disclose that information, so whether it was that morning prior to trial or right before she testified, that duty is still there. That testimony was still a complete surprise to the defense counsel when she uttered those alleged words from David, that I'm going to go and I'm going to shoot Joseph. When you go to the fourth factor, I believe, in Robinson of the prejudice, had this been disclosed before, what steps might have been taken? Well, that's a good question, Your Honor. I think if the prosecutor had followed Rule 12 and disclosed this information like he should have to the defense counsel when he learned of it, at that point, the defense counsel could have asked for a continuance. I think in that instance, a continuance makes sense. At that point, the jury has not heard this testimony. The defense counsel hasn't been made to look like a liar in the eyes of the jury or at least incompetent for not addressing this statement. At that point, the defense counsel could have investigated the circumstances of this alleged statement further. We don't know what he would have found. They could have had more time to develop an alternate defense theory or at least adjusted their opening statement to reflect the existence of this statement. You're in the middle of a jury trial. Would that have been a viable relief to the defense to have a continuance that time? Not at that point, Your Honor. That's what makes this case unique. At that point, the cat's out of the bag. The jury has heard this alleged oral confession by the defendant, and this is the only direct evidence of the plan that shows that he could have been accountable for this offense. And at that point, the defense counsel's credibility is at issue with the jury there, and there's just no way that a continuance would undo that damage at that point. The only remedy that would address the damage that was done to the defense theory and to the credibility of the defense counsel is a new trial at that point. Your Honors, I can't state strongly enough that this, what's so important about this case is that this evidence was the sole direct evidence that supported an accountability finding for this attempt to murder that Mr. Luna was convicted for. The defense counsel was completely surprised. It made him look bad in front of the jury. It made him completely kind of off the cuff come up with this alternate defense theory, and that violates the central purpose of this Rule 412, and that's to prevent against this unfair surprise, and for those reasons, David Luna requests that he be granted a new trial. Thank you. Thank you. Good morning, Your Honor. Good morning. My name, again, is Bill Toffinetti. I'm an assistant state's attorney for Cook County. Your Honor, I would like to open by saying that there is, I read the record the same way a defendant does as to how the statement came out. There does appear to have been an error. The statement was not disclosed prior to testimony. There is nothing in the record, however, to indicate that this was a willful failure on the part of the people. This was an inadvertent mistake. They knew about it. They knew about it when they interviewed her. They knew about it when they interviewed her. Even if it came up that morning, they knew about it. Why didn't they tell defense counsel? I can only presume, because it's not in the record, I can only presume that they lost track of what was in discovery, okay, and that they thought that they had tendered it but did not. It's an error. It should not have happened, okay? The judge did not conduct a hearing into this matter. There's no evidence one way or the other as to the willfulness or the circumstances of how this came to be. The judge was satisfied. He said, motion for mistrials denied. You had ample opportunity to cross-examine. So he was satisfied that it had been incurred. Well, the judge was correct to be satisfied because, first, there's no evidence of willfulness. Second of all, there's really no evidence of prejudice. Defendant did have ample opportunity to cross-examine. And, in fact, he did everything that he would have been able to do if he had known about the statement. Wait a minute. Wait a minute. If he had known about the statement, perhaps he might have adjusted his defense. His opening statement could have been different. He could have attempted to blunt the effect of it. He could have had a different interpretation of what was meant. I'll tell you, when I read the words that she said, quote, lick those niggers, I thought a lick was a robbery, not a shooting. That's the way it's always been portrayed down here, what a lick is. Well, that's one of the arguments defense counsel made to the jury. We don't know what she meant. But he just found out about it when she slipped it out on direct examination. That's the first hint he had it was coming. I understand that. And he recovered beautifully. I don't doubt it caused him some discomfort. But he was able to recover to the point where defendant was acquitted of the first-degree murder. That's the crime that apparently, according to the statement that she made, that's the crime they were going over there to commit. So what does defendant do? He cross-examines her about the fact that she never told the police, she never told the state's attorney until that morning, she didn't tell the grand jury about this statement. So when's the first time you tell anybody? This morning. Why is that? Because your boyfriend is going to prison and you don't want defendant to be the only one. Why do we have discovery rules? I'm sorry? Why do we have discovery rules? I'm having a hard time. Why do we have discovery rules? To prevent surprise. Exactly. Wasn't there surprise there? Yes, there was. However, it is not per se reversible. And defendant not only recovered, he actually won the point. He convinced the jury that his client was not guilty of first-degree murder. And the statement as to the second crime, the attempted first-degree murder, is wholly and completely irrelevant. Defendant either did not have the intent when they were going over there to commit any crime, that was his original theory, or he withdrew from that intent by telling Daniel Vargas, chill, let's get out of here, forget it. And defendant asked for and received an instruction on withdrawal. The jury took one or the other of those alternatives. What about the question that was sent out by the jury and the answer given by the judge? And the state concedes that it was an incorrect answer on accountability. Yes, sir. Well, couldn't it have been that there were jurors who were talking about other crimes that might have been intended by this pair that came over there? I don't think so. I don't think you can fairly say that with the fact that before the attempted murder was committed, defendant was found not guilty, okay, of the intended crime. Well, they went over there to get the money back from the drug deal. But he did not intend to go over there, according to their theory and according to what the jury determined, did not go over there with any violent intent. What makes him guilty of the attempted murder is not what happened before the statement or with the statement. What makes him guilty is the fact that when Daniel Vargas takes out the gun and fires, shoots somebody, the defendant at that point doesn't matter what he knew or what he intended before. He's on notice. There's crimes being committed here. His partner, the guy he went over there with, has a gun. He can't claim surprise anymore. He knows it. So what does he do? Your argument begs the question because a greater intent was required by the jury to find him guilty of attempt murder than it was murder. It's a specific intent crime. It's specific intent to aid in a bet. He doesn't have to have specific intent to commit the attempted murder. That's imputed to the guy who actually shoots the gun. But if defendant attaches himself to the shooter by running back to his car, getting in his car, and waiting for the defendant, for Daniel Vargas, and he knows now that Vargas is shooting people. He can hear the gunshots. He was there when the first shot occurred. Doesn't he try to calm him down while they're over there? That was before the gun went off. And when the gun goes off, he runs, no question about it. And if he had gotten his car and driven away, we wouldn't be here this morning. He wouldn't be guilty of anything. But he didn't. He waited for Daniel Vargas to drive him away to a place of safety. And by attaching himself to Daniel Vargas at that time, by that action, he makes himself accountable for whatever Daniel Vargas does during the course of that interim period. Well, the jury had some question about it. And the question that they sent out to the judge and the answer he gave was not in accordance with the law. And you concede that. Yes, sir, I do. I do concede that. But I don't think it makes any difference because the verdict is consistent with both the facts and the law. And we really cannot presume to know what the jury found. We do know that the facts make the defendant liable for attempted murder under accountability theory. And the defendant does not argue any one way or the other as to the impact of the judge's erroneous answer. So we have to go with the verdict and the facts and the law. And they're all consistent. And it's consistent with all of the facts. It's consistent with the finding of not guilty on the first degree of murder. Defendant attached himself to Daniel Vargas after the first degree of murder. And he made himself accountable. And that's why the statement, which is what we're all arguing about here, that's why the statement that Vanessa Cernan apparently possibly made or testified to that Daniel Vargas, or excuse me, defended me, that she testified to, is irrelevant. It's irrelevant to the second crime because his intent to aid in a bet arose after the first degree of murder for which he was acquitted. Thank you, Your Honor. I appreciate the opportunity to answer my point. Thank you. I'll be brief, Your Honors. I just want to address the State's contention that the evidence supported this attempt murder conviction here. My understanding of the State's position is that David was guilty of that offense, notwithstanding his acquittal for the first degree murder case, because he merely ran to the car and then drove Vargas away after the fact. But from People v. Perez and that whole line of cases, it makes clear that mere presence at the scene and then subsequent flights after the offenses are over, that does not equal accountability. If the judges don't have any other questions, that's all I have. Thank you. Thank you, Your Honors. The matter will be taken under advisement. Thank you, gentlemen. Call the next case.